UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

Case No. 20-cr-20095

v

HON. MARK A. GOLDSMITH

KENYODA HOLMES,

    Defendant.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION FOR PRETRIAL RELEASE (Dkt. 14)**

This matter is before the Court on Defendant Kenyoda Holmes's motion for pretrial release (Dkt. 14). Holmes contends that his release is warranted under 18 U.S.C. §§ 3142(g) and 3142(i), given the health risks presented by his continued incarceration during the COVID-19 pandemic. For the reasons that follow, the Court denies Holmes's motion.[1]

**I. BACKGROUND**

A grand jury indicted Holmes on one count of escape from custody. Indictment (Dkt. 9). The criminal complaint alleges that Holmes was serving a term of supervised release at a residential reentry center ("RRC") and that he was not allowed to leave the RRC without permission. Compl. ¶¶ 4-5 (Dkt. 1). On November 6, 2019, Holmes was permitted to leave the RRC to go to work. Id. ¶ 7. When the RRC attempted to verify Holmes's arrival at work, his employer reported that Holmes had taken the day off. Id. RRC staff immediately contacted Holmes and ordered him to return to the RRC. Id. Holmes returned but subsequently left the RRC

---

[1] Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. Administrative Order 20-AO-024 (providing that motions to review detention orders "will be decided on the papers submitted, unless the assigned judge orders otherwise").

with all of his belongings. Id. at ¶¶ 7-8. Holmes was thereafter located and arrested in Charleston, West Virginia. Id. ¶ 9. The Government alleges that Holmes was arrested after the United States Marshal Service arranged a purchase of a controlled substance from him. Gov't Resp. at 9 (Dkt. 15).

Holmes's criminal history outlined in the pretrial services report ("PSR") proffered by the Government supplies vital context and background to the charged offense. In July 2011, Holmes was sentenced by the Southern District of West Virginia to a term of imprisonment after being convicted of felon in possession of a firearm and distribution of a controlled substance. PSR, Ex. 1 to Gov't Resp., at 7 (Dkt. 15-1). The felon-in-possession charge stemmed from officers' discovery of a handgun in Holmes's waistband during a November 6, 2010 arrest on an unrelated warrant, while the distribution charge arose from law enforcement's controlled purchase of heroin from Holmes in January 2011. Id. at 7-8. Holmes served a term of his sentence in custody and was released on supervision on October 1, 2014. Id. at 7. On March 28, 2016, his supervised release was transferred to the Eastern District of Michigan. Id.

In May 2016, the Eastern District of Michigan issued a warrant for Holmes's arrest in connection with multiple violations of his supervised release. Id. Four of the violations involved Holmes's sale of heroin on four occasions in April 2016, to a confidential informant in Charleston, West Virginia. Id. at 7-9. When a search of Holmes's residence was executed on April 28, 2016, law enforcement discovered drugs, a firearm, and drug paraphernalia. Id. at 9. Three additional supervised release violations included leaving the Eastern District of Michigan for West Virginia without permission in March 2016; associating with criminal offenders and known members of the Seven Mile Bloods street gang; and failing to notify his probation officer of his police contacts. In August 2016, Holmes admitted or was found to be in violation of seven conditions of his release

2

and was sentenced to twenty-four months' incarceration for these violations.  Judgment, United States v. Holmes, Case No. 16-cr-20065 (Dkt. 9).

Holmes served his sentence for the supervised release violations, as well as a consecutive sentence imposed by the Southern District of West Virginia in connection with the April 2016 heroin sales.  See PSR at 9.  On April 25, 2018, Holmes was released on supervision to the RRC, id., from which he absconded in November 2019.

Holmes made his initial appearance in connection with the present escape charge on February 7, 2020, and he consented to detention pending trial.  See Consent Order of Detention Pending Trial (Dkt. 7).  However, he now seeks pretrial release.

## II. ANALYSIS

Holmes contends that his pretrial release is warranted under 18 U.S.C. §§ 3142(g) and 3142(i) in light of the risks posed by the COVID-19 pandemic.  The release or detention of a federal defendant pending trial is governed by 18 U.S.C. § 3142.  In general, "[t]he default position of the law . . . is that a defendant should be released pending trial."  United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010).  However, a defendant may be detained pending trial if a judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).

In determining whether any condition or combination of conditions would reasonably assure the appearance of the defendant and the safety of the community, the Court must evaluate the available information concerning: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g).  The Government bears the burden of persuasion and must prove risk of flight

3

by a preponderance of the evidence, and danger to another person or the community by clear and convincing evidence. United States v. Hinton, 113 F. App'x 76, 77-78 (6th Cir. 2004).

Under 18 U.S.C. § 3142(i), a judicial officer may "permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Some courts have held that the COVID-19 pandemic presents a compelling reason justifying pretrial release. See, e.g., United States v. Kennedy, No. 18-20315, 2020 WL 1493481, at *4 (E.D. Mich. Mar. 27, 2020).

Applying the § 3142(g) factors below, however, the Court finds that the Government has met its burden of proving that Holmes would present a risk of flight and a danger to the community were he to be released. Further, Holmes has not established that COVID-19 presents a unique and compelling risk to him personally that would justify his release under § 3142(i).

### A. Nature and Circumstances—18 U.S.C. § 3142(g)(1)

Under 18 U.S.C. § 3142(g)(1), this Court is to consider the nature and circumstances of the offense charged, including whether the offense involves a controlled substance, firearm, explosive, or destructive device.

In the present case, Holmes is alleged to have lied to RRC staff regarding his whereabouts and to have subsequently absconded out of state to Charleston, West Virginia. He was arrested after law enforcement allegedly arranged to purchase a controlled substance from him. And the seriousness of Holmes's conduct is further exacerbated by the fact that he was on supervised release as a result of his conviction for distribution of heroin in April 2016. Indeed, Holmes is an inveterate drug dealer, as demonstrated by his robust criminal history for controlled substance offenses. See generally PSR. The Sixth Circuit "routinely affirms, on dangerousness grounds, the

4

pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." Stone, 608 F.3d at 947 n.6. Thus, when considered in the context of Holmes's history, the offense charged is serious and weighs in favor of his detention.

### B. Weight of the Evidence—18 U.S.C. § 3142(g)(2)

Title 18 U.S.C. § 3142(g)(2) instructs this Court to consider "the weight of the evidence against the person." This factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." Stone, 608 F.3d at 948; see also United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985) (weight-of-evidence factor "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community").

Here, the weight of the evidence of Holmes's dangerousness and risk of non-appearance is strong. Holmes has an extensive criminal record that is replete with probation and supervised release violations and failures to appear. Holmes's criminal history since 2011 is summarized above. But Holmes has had contact with the criminal justice system in some capacity every year since 2007, when he pleaded guilty to attempted delivery of a controlled substance. PSR at 4. In 2008, Holmes pleaded guilty to attempted carrying of a concealed weapon stemming from officers' investigation of a tip that narcotic sales and gunshots were occurring at Holmes's residence. Id. at 5. In 2009, Holmes was charged with possession of drugs or possession with intent to distribute controlled substances no fewer than three times. PSR at 5-6. And in 2010, he was charged with carrying a dangerous weapon twice. Id. at 6-7.

In total, Holmes has collected three convictions for delivery or distribution of a controlled substance, one conviction for felon in possession of a firearm, and one conviction of attempted carrying of a concealed weapon. Additionally, Holmes has violated probation or supervised

5

release nine times, has failed to appear in court twice, and has been rearrested while on bond once. When Holmes was arrested following his escape from the RRC, he had collected three bench warrants for failure to appear on traffic offenses. Addendum to PSR, Ex. 2 to Gov't Resp., at 2 (Dkt. 15-2).

The weight of the evidence demonstrates that Holmes would present a danger to the community if released, given his significant history of gun- and drug-related charges. Additionally, Holmes allegedly returned to selling drugs shortly after absconding from the RRC in 2019. The weight of the evidence also demonstrates that Holmes presents a risk of flight, given his repeated disregard for the terms of his probation and supervised release and his poor record for appearing at court proceedings. Accordingly, this factor strongly favors detention.

### C. History and Characteristics—18 U.S.C. § 3142(g)(3)

Under this factor, this Court must consider the following:

> [T]he history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . .

18 U.S.C. § 3142(g)(3).

As described above, Holmes has an extensive criminal history with numerous instances of probation and supervised release violations, which weighs in favor of his continued detention. Additional personal factors also favor detention. First, Holmes has a history of substance abuse, reporting that he has abused alcohol and a variety of drugs. PSR at 3. Although Holmes completed

6

a ninety-day substance abuse counseling program in 2007 as a condition of his juvenile probation, he nevertheless reported significant substance abuse following completion of that program. Id. at 3-4. Holmes completed another drug education program in 2012, but in 2014 reported he had no interest in participating in the residential drug treatment program offered by the Bureau of Prisons. Id. at 4. Holmes's substance abuse—especially coupled with his history of controlled substance distribution—would likely cloud his already poor judgment, thereby increasing his dangerousness and risk of flight.

Second, Holmes has significant ties to Charleston, West Virginia, rendering him a significant flight risk. Two of Holmes's children reside in Charleston, and he reports that he frequently travels to Charleston to visit them. Id. at 2. Additionally, many of Holmes's convictions stem from offenses committed in Charleston, including his 2011 convictions for felon in possession and distribution of heroin, and his 2017 conviction for distribution of heroin. Id. at 7, 9. Holmes also violated the terms of his supervised release in 2016 by leaving the Eastern District of Michigan without permission to travel to Charleston. Judgment, United States v. Holmes, Case No. 16-cr-20065 (Dkt. 9). After absconding from the RRC, Holmes once again travelled to Charleston. Compl. ¶ 9. Holmes's connections to and proclivity to travel to Charleston render him a significant flight risk. Accordingly, Holmes's history and characteristics favor his detention.

### D. Danger to Community—18 U.S.C. § 3142(g)(4)

Under the pertinent part of 18 U.S.C. § 3142(g)(4), this Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

Here, the evidence demonstrates that Holmes has no regard for the conditions of his probation or supervised release. Holmes has engaged in criminal behavior, including selling

7

controlled substances, even while on supervised release. "To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community." Stone, 608 F.3d at 947 n.6; see also United States v. Leon, 766 F. 2d 77, 81 (2d Cir. 1985) ("the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'")). Further, Holmes has a history of leaving the judicial district without permission, as well as a history of nonappearance. As with the other § 3142(g) factors, this factor weighs in favor of Holmes's detention.

### E. COVID-19

Holmes contends that pretrial release is warranted in light of the health risks posed by continued incarceration during the COVID-19 pandemic. The Court is mindful of the exceptionally grave and unprecedented nature of COVID-19, which has continued to spread exponentially throughout the State of Michigan. And as acknowledged by the Centers for Disease Control and Prevention ("CDC"), incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities. See Kennedy, 2020 WL 1493481, at *2. These conditions include, among other things, the highly congregational environment, the limited ability of incarcerated persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing), and potentially limited onsite healthcare services. Id. Indeed, Holmes expresses his deep concerns with such conditions in his briefing. See Pl. Mot. at 7-9; Pl. Supp. Br. at 3-6 (Dkt. 19). Prisons and courts have responded to the dangers presented by COVID-19 by attempting to reduce the number of incarcerated persons housed within a given detention facility, as appropriate. See Kennedy, 2020 WL 1493481, at *2; see also Jails in Saginaw and Bay Counties See Drop in Inmate Population Amid Coronavirus, Ex. A to Def. Supp. Filing (Dkt. 16); Michigan Courts News Release, Ex. C to Def. Supp. Filing (Dkt. 16-2).

While the generalized risks of COVID-19 cannot be disputed, courts evaluating whether pretrial release is necessary must evaluate the particularized risks posed to an individual defendant. United States v. Lee, No. 19-20112, 2020 WL 1540207, at *3 (E.D. Mich. Mar. 30, 2020). Some courts evaluating the impact of COVID-19 on the pretrial release calculus under 18 U.S.C. § 3142(i) have considered the following four factors:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

United States v. Clark, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020).

First, as discussed above, the § 3142(g) factors overwhelmingly demonstrate that Holmes presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety the community and his appearance in court. This factor weighs decidedly in favor of Holmes's continued detention.

Second, Holmes's concerns are generalized and speculative. Holmes, who is twenty-nine years old, claims that he has experienced headaches but has identified no personal health condition rendering him at greater risk of either contracting COVID-19 or developing severe complications from the virus. See Def. Mot. at 9; see also United States v. Dodd, No. 20-0016, 2020 WL 1547419, at *3 (D. Minn. Apr. 1, 2020) (denying release on the grounds that the defendant had not offered evidence of a personal health condition). Accordingly, Holmes "has not shown how the dynamics of the current COVID-19 situation relate to him particularly in a way that could not be said of all detainees . . . ." Id.; see also United States v. Munguia, No. 3:19-cr-191-B, 2020 WL 1471741, at *4 (N.D. Tex. Mar. 26, 2020) ("Defendant's argument applies equally to every detainee in detention; however, the Court cannot release every detainee at risk of contracting

9

COVID-19 because the Court would then be obligated to release every detainee.").

Nor has Holmes demonstrated that he has been exposed to the virus as a result of his incarceration. To the contrary, the Government responds that Lieutenant David Kerns of the Saginaw County Sheriff's Office reports that no prisoners currently incarcerated at the Saginaw County Jail ("Saginaw"), where Holmes is detained, have been diagnosed with COVID-19 as of April 13, 2020. Gov't Resp. at 14-16 (Dkt. 15); Gov't Supp. Br. at 2 (Dkt. 18).[2] Holmes is sheltering in place in Saginaw's South Dorm along with fifteen other federal detainees, and has had no contact with individuals in custody in other areas of the facility. Gov't Resp. at 15-16. While Holmes asserts that the detainees in the South Dorm have exhibited symptoms indicative of COVID-19 such as coughing or fever, Def. Mot. at 10, Saginaw's medical director reports that there have been no complaints regarding COVID-19 symptoms from the detainees housed in the South Dorm, Gov't Resp. at 16.

Saginaw is currently in the process of moving detainees to its newly constructed facility. See Saginaw County Sheriff's Department Shuttles Inmates Into New Jail, available at https://www.abc12.com/content/news/Saginaw-County-Sheriffs-Department--shuttles-inmates-into-new-jail-569548211.html (last visited April 16, 2020). At the new facility, federal inmates will likewise be completely segregated from the general population and will not eat meals or engage in recreation with other inmates outside their pod. Gov't Supp. Br. at 5. The pod housing

---

[2] Saginaw reports that on March 19, 2020, one inmate at the facility was hospitalized after developing a fever. Gov't Resp. at 16 n.1. His COVID-19 test was ultimately determined to be positive, but he recovered from all symptoms. Id.; Gov't Supp. Br. at 2. After his release from the hospital, he was not returned to Saginaw. Gov't Resp. at 16 n.1. He had no contact with any federal inmate in the South Dorm, and all other inmates in his dorm were quarantined for sixteen days. Id.; Gov't Supp. Br. at 3. His isolation cell was sanitized by an outside company. Gov't Resp. at 16 n.1. One other state inmate is awaiting the results of a COVID-19 test. Id. He is not housed in South Dorm, is not a federal detainee, and has not been in any proximity to Holmes. Id.

10

the sixteen federal inmates is separated into two levels, with two inmates sharing one cell. Id. at 5. The two levels are to rotate mealtimes and recreation time in order to reduce contact amongst the detainees within the same pod. Id. at 5-6. Additionally, the new facility is larger and, therefore, allows for more separation between inmates. Id. at 5.

Further, Saginaw has implemented a variety of precautions—both at its current and new facilities—in an effort to reduce the risk of COVID-19 transmission within the jail. Gov't Resp. at 17-18; Gov't Supp. Br. at 4-5. All new inmates are being screened for fever and other COVID-19 symptoms before entering the jail. Gov't Resp. at 17. If an inmate exhibits any positive symptoms, that individual would be transported directly to a local hospital for medical clearance. Id. Once medically cleared, that person would be admitted to the jail but would be quarantined for fourteen days. Id. Further, Saginaw has acquired rapid COVID-19 tests, enabling it to test for the virus expeditiously. Gov't Supp. Br. at 3. If any inmate were to test positive for the virus or exhibit any signs of illness, Saginaw asserts that person would be immediately quarantined. Id. Further, Saginaw would request that any inmate who tests positive be released on bond. Id.

Saginaw's old facility has been undergoing a heavy cleaning regimen, and detainees at both the old and new facilities are being provided with cleaning supplies such as disinfectant for use inside their cells. Gov't Resp. at 17; Gov't Supp. Br. at 3. Staff members are screened daily with a questionnaire and temperature check and have been directed not to enter the facility if they feel sick. Gov't Resp. at 17; Gov't Supp. Br. at 4. Additionally, staff members are working staggered shift rotations such that they work seven consecutive days, followed by fourteen days off to monitor for development of any symptoms. Gov't Supp. Br. at 4. Saginaw has ceased all visitation from family members and attorneys. Gov't Resp. at 17. Finally, all social programming for detainees has been suspended. Id. Such measures are consistent with those recommended by the

11

CDC. See Kennedy, 2020 WL 1493481, at *2. This Court has not discovered any press coverage contradicting the Government's representations regarding the conditions and precautions being implemented at Saginaw.[3] This factor, therefore, also weighs in favor of continued detention.

Third, Holmes has not explained how his release would minimize his risk of contracting COVID-19. Although Holmes proposes home confinement and electronic monitoring, with his mother and brother to serve as custodians, he does not explain who else will reside at or frequent the home, or identify any COVID-19 precautions being implemented there. See United States v. Smoot, No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020). In contrast, the record demonstrates that access to Saginaw is limited and strictly enforced, thereby minimizing Holmes's potential exposure to the virus. See id. This factor weighs in favor of Holmes's continued detention.

Finally, Holmes's release to home confinement would increase the risk of others contracting COVID-19. As other courts have recognized, "'[a] defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.'" Id. (quoting Clark, 2020 WL 1446895, at *7); see also United States v. Aiad-Toss, No. 19-00521, 2020 WL 1514482, at *2 (N.D. Ohio Mar. 30, 2020) (noting that releasing a defendant to home detention and electronic monitoring unduly burdens pretrial services officers, who must perform installation and monitoring). Holmes's history of probation violation and

---

[3] Indeed, Saginaw recently declined to admit a man who displayed COVID-19 indicators and is limiting its intake of new detainees to new arrests for violent crimes. See MLive Saginaw and Bay City News, available at https://www.mlive.com/news/saginaw-bay-city/2020/04/man-not-admitted-to-saginaw-county-jail-after-displaying-coronavirus-symptoms.html (last visited Apr. 10, 2020).

12

nonappearance renders these concerns all the more troubling. Additionally, Holmes's release may increase the risk of infection to the family members with whom he would reside. See Dodd, 2020 WL 1547419, at *3. Consequently, this factor likewise favors Holmes's continued detention.

In sum, these factors do not demonstrate that Holmes's pretrial release is warranted in light of the risks presented by the COVID-19 pandemic.

### F. Preparation of a Defense

Holmes also contends that the preparation of his defense has been hampered because Saginaw has suspended attorney visitation and because phone calls are not entirely private. Def. Reply at 17. But Saginaw reports that attorneys may visit with inmates via the facility's teleconference device. Gov't Resp. at 16. Indeed, prisons are obligated to permit unmonitored calls with legal counsel. Title 28 C.F.R. § 540.102 provides that prison "[s]taff may not monitor an inmate's properly placed call to an attorney. The Warden shall notify an inmate of the proper procedures to have an unmonitored telephone conversation with an attorney." And while Holmes states generally that phone calls are not entirely private, he does not specifically allege that he has requested privacy to place an unmonitored call to his attorney—or that such a request has been denied.

Further, there is no evidence that the preparation of Holmes's defense is being hampered by the visitation restrictions. As argued by the Government, this case is straightforward and involves less than thirty pages of discovery regarding Holmes's escape from the RRC and subsequent arrest in Charleston, West Virginia. Gov't Resp. at 14. Additionally, the Government asserts that it has presented Holmes with a Rule 11 plea agreement, and that the parties agree on all but one issue relative to the plea. Id. at 8-9. Accordingly, the limitations on attorney visitation are not sufficient grounds justifying Holmes's pretrial release.

13

## III. CONCLUSION

For the reasons discussed above, the Government has proved by clear and convincing evidence that Holmes presents a danger to the community and by a preponderance of the evidence that he presents a risk of flight. It has, therefore, met its burden of establishing that no condition or combination of conditions could reasonably assure the safety the community and his appearance in court. Accordingly, the Court finds that Holmes must remain detained pending trial. Holmes's motion for pretrial release (Dkt. 14) is denied.

    SO ORDERED.

Dated: April 17, 2020　　　　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge